**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES,

          Plaintiff,

v.

DAWN HANNA (D-1),

DARRIN HANNA (D-2),

          Defendants.
_____/

CASE NO. 07-CR-20355

HON. MARIANNE O. BATTANI

**OPINION AND ORDER DENYING DEFENDANTS' MOTION
TO SUPPRESS EVIDENCE SEIZED UNDER SEARCH WARRANTS**

Before the Court is a motion brought by Defendants Dawn and Darrin Hanna to suppress evidence seized under two search warrants executed on June 25, 2004: one authorized the search of Defendants' place of business Technology Integration Groups Services ("TIGS"); the other authorized the search of Dawn Hanna's America Online e-mail account. See Doc. No. 37. The Court heard oral argument on May 21, 2008, and at the conclusion of the hearing took this matter under advisement. For the reasons that follow, the Court **DENIES** the motion.

**I. FACTS**

Defendants are charged with one count of conspiracy to export telecommunications equipment and global positioning systems ("GPS") to Iraq in violation of 18 U.S.C. § 371, six counts of illegally exporting or attempting to export equipment in violation of 50 U.S.C. § 1705(b), one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h), and one count of forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 928 (a)(1),

and 28 U.S.C. § 2461. Dawn Hanna also is charged with one count of making false statements in violation of 18 U.S.C. § 1001(a)(2).

According to the indictment, from 2001 through 2003, Defendants, through their business, exported telecommunications and other equipment to Iraq in violation of an economic embargo. During the relevant time frame, Darrin Hanna was the president and owner of TIGS; Dawn Hanna was the vice president of sales. According to its website, TIGS "provides customers with computer systems and software for sales, operations, management information systems, network systems design and administration and product research and development." Defs.' Ex. 1, Aff., ¶ 4. The government contends that Defendants worked with others, including Emad Yawer and his Jordanian company, Advanced Technical Systems ("ATS"), as well as an ATS-affiliated company, Dresser International Group, and its general manger, Walid Al-Ali a/k/a Walied Al-Aly. Defendants also worked with Skyport Freight, a freight forwarder in London, England.

During the course of business, Defendants purchased equipment from domestic and European suppliers and shipped the equipment to Iraq via Syria. After Defendants had completed four shipments, and received approximately $9.5 million in proceeds, customs officials in England intercepted a shipment. A subsequent shipment was intercepted in Chicago.

The government successfully sought the two search warrants challenged here in June 2004. The facts supporting the requests for the search warrants are detailed in the affidavit of Brian C. Wallace, United States Immigration and Customs Enforcement Special Agent. Aff., ¶ 1. The information offer to support the requests builds on information

gained through the investigation of two shipments that were detained en route, statements made by Dawn Hanna, statements made by employees of companies doing business with TIGS, and documents found in the trash at TIGS.

**A. London**

According to Wallace, in January 2003, Her Majesty's Customs and Excise (HMCE) received information from a representative of Skyport Freight, the freight forwarder contracted to ship the equipment to Syria, that TIGS was shipping ten tons of telecommunications equipment for export to Turkey. Id., ¶ 17. A UK company, Shields Environmental, PLC ("Shields"), had obtained the equipment on behalf of TIGS from a variety of sources. Id. HMCE determined that the declared destination was an apartment complex, which HMCE believed to be an unlikely destination for the equipment. Id. An employee of Shields informed HMCE that a shipment of telecommunications equipment was being prepared for shipment to a TIGS customer, Dresser International ("Dresser"), for end use in Turkey, and that another shipment had taken place in December 2002. Id., ¶ 18. The employee also indicated that a representative of ATS stated that the telecommunications equipment TIGS shipped was to be used in an emergency, like war. Id.

HMCE agents questioned Dawn Hanna about the shipment. Id., ¶ 19. She stated that she did not know the identity of the end user; however, she subsequently provided contact information for ATS/Dresser International. Id. Dawn Hanna also explained that the goods were passing through Syria and Jordan to the final destination of Turkey, because Syria and Jordan were free trade zones without duty, an explanation that makes little sense

given the fact that Turkey also is a free trade zone.  Id.

Later, when HMCE advised TIGS that a license rating would be required for the shipment as well as a more detailed description of the equipment being shipped, TIGS moved the equipment to a warehouse for shipment to France instead of providing the additional information.  Id., ¶ 20.  HMCE detained the shipment before it was sent.  Id.

Darrin Hanna subsequently contacted HMCE to clarify TIGS' position regarding the detained shipment.  Id., ¶ 21.  Although he identified the end user as Dresser International, he indicated that the equipment could be sold to British companies to avoid problems.  Id.

**B. Chicago**

Wallace also includes information in his affidavit about a TIGS shipment that was detained in Chicago for incomplete invoice documentation on February 14, 2003.  Id., ¶¶ 5-11.  According to export documents, TIGS was exporting six Visioneer Strobe XP 100 Scanners and one Hewlett-Packard Design jet 500 plotter to ATS/Dresser, in Amman Jordan, via Syria.  Id., ¶ 6.  The container also included global positioning systems, tide gauges and related equipment from Mercator, Inc., a Texas corporation, and two dipole antennas Mercator had purchased from an Oregon company.  Id.

On February 23, 2003, government agents interviewed Dawn Hanna.  She stated that about 10 percent of TIGS' business was foreign exports, but indicated she was unaware of any illicit trade with Iraq.  Id., ¶ 8.  She told the agents that ATS was paying for the purchase, that TIGS had facilitated the purchase of equipment from Mercator, that she knew the ultimate destination was Turkey, but that she did not know the identity of the end user.  Id., ¶ 9.  Dawn Hanna also indicated that the shipment was going to Jordan initially at ATS' request because ATS might use some of the equipment itself.  Id.

During the interview, the Customs agents received a faxed copy of a letter of credit and purchase order pertaining to the detained shipment. Id., ¶ 10. Dresser in Jordan agreed to wire TIGS $4,950,000. Id. Dawn Hanna told agents that Dresser financed the transaction for ATS. Id. Also included in the documents pertaining to a letter of credit was an acceptance certificate issued and signed by Dresser's agent, Walied Al-Aly. Id.

### C. Yaser Rashid

The detained shipment also included a small box addressed to Yaser Rashid, an Iraqi national who worked for ATS. Id., ¶ 12. Customs agents subsequently interviewed Yaser Rashid's parents, who resided at the California address marked on the box. Id., ¶ 13. Ayda Rashid told agents her son believed that the equipment was going to Iraq. Id., ¶ 14.

Rashid, who was interviewed in Iraq, confirmed this belief although he had been told that he would be working in Jordan. He told agents he was sent to the US to train on the GPS equipment so that he could train other ATS employees. Id., ¶ 15. Rashid believed the equipment would go to Iraq because he worked primarily in Baghdad, had received expensive one-on-one training, and he knew that the seaport in Jordan already had GPS units and that the small number ordered would not cover a seaport, the size of Jordan's. Id. He told his mother that the equipment was need in Fao, Iraq. Id. Rashid never provided training to ATS employees. Id.

### D. Other Documents

Next, Wallace relies on the discovery of an official memorandum, found in Iraq after Baghdad fell, indicating that ATS had breached its contract to provide the Iraqi government

with 500 receivers during the same time TIGS sent shipments to ATS. Id., ¶ 16. Wallace also relies on an undated e-mail/letter found in the July 18, 2003, search of TIG's trash to support the warrant. The letter concerns goods sent to Iraq via Syria, and is authored by Walied Al-Aly, an agent for Dresser International Group and sent to Charles (believed to be Charle Malas, the director of Skyport Freight).[1]  Id., ¶ 23. The e-mail/letter also discusses a disagreement between Skyport, TIGS, and Global Telecommunications over the payment of funds. In addition, the search of the trash showed an e-mail sent to Dawn Hanna regarding contacts in Iraq albeit at a time when it was legal to do business in Iraq. Id., ¶ 24.

### III. ANALYSIS

Defendants raise two challenges to the search warrant. First, they contend that the affidavit, which was used in support of both search warrants, contained false statements so the evidence discovered in the searches must be suppressed. Second, the warrants were overbroad. The Court discusses the merits of the arguments below.

**A. Existence of Probable Cause**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. CONST. amend. IV.  In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that when an affidavit in support of a search warrant contains false statements made knowingly or recklessly, evidence obtained pursuant to the warrant must be suppressed

---

[1] This conclusion is based on a number of e-mail print-outs found in the tash between Charle Malas and TIGS personnel. Some of the e-mails refer to Charle Malas as "Charles."

6

if the false information was necessary to a finding of probable cause.

Accordingly, to succeed on their motion, Defendants must show that Wallace knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause. Id., 438 U.S. at 155-56. Although the Franks doctrine applies to both, United States v. Bonds, 12 F.3d 540, 568-69 (6th Cir. 1993), additional hurdles must be met when the issue raised is omitted facts. See Mayes v. Dayton, 134 F.3d 809, 816 (6th Cir. 1998). In U.S. v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997), the appellate court observed that allowing omissions to be challenged would create a situation where almost every affidavit would be questioned. "Consequently, where the defendants show that an affidavit rested on deliberate falsehood or a reckless disregard for the truth, the reviewing court must set aside those tainted portions of the affidavit (or in the case of deliberate or reckless omissions, include them in the affidavit) and then determine whether probable cause still exists. If so, the affidavit, and the warrant, stand." Bonds, 12 F.3d at 569, n.23 (citation omitted).

### 1. Characterization of the false statement

The parties disagree as to whether this is a case involving false statements, or merely omissions. Defendants characterize the inclusion of the Al-Aly letter/e-mail, obtained from TIGS' trash, as a false statement because the signor's name is misspelled, and it does not appear on letterhead of Dresser International Group whereas other documents in the government's possession such as the acceptance certificate documents, spell Al-Aly's name correctly and are on company letterhead. Defendants conclude that

Wallace intentionally misled the magistrate judge in that he advanced the position that Al-Aly was an agent of Dresser International, when the real agent was Al-Ali.

Defendants cannot meet their burden to show that the affidavit was deliberately or recklessly false. Wallace correctly quoted the July 2003 e-mail/letter indicating goods have been shipped to Iraq. The affidavit spells the name, "Al-Aly," the way it was spelled in the e-mail/letter. Although Defendants assert that letter was a fraud, the two different spellings indicates something less than fraud. First there is no evidence that the affiant noticed the spelling variation or that he thought it was significant. Other explanations for the discrepancy exit. The Government argues that Arabic names are often spelled in a variety of ways when translated in to English, which uses a different alphabet. Thus, the difference between Walid and Walied or Ali and Aly is not so noteworthy or unusual to suggest fraud. Moreover, the difference may merely reflect the e-mail/letter was written by an assistant whose first language was not English. Further, the fact that the search yielded a copy of the e-mail/letter as an attachment to e-mail messages between Defendants and Yawer undermines any contention of fraud. <u>See</u> Govt.'s Ex. 2.

More important to the finding of probable cause, according to the Government, is the content of the letter. The "Charles" to whom the letter is addressed is thought to be the director of Skyport Freight. Al-Aly thanks Charles for his help and support "in shipping our goods to Iraq via Syria." The fact that the letter is on plain paper is explained by the fact that the items recovered in the trash were e-mail messages. The informal nature explains the absence of letterhead.

The Court agrees with the Government, and rejects Defendants' position that the

8

inclusion of the e-mail/letter constituted a false statement. Therefore, the Court focuses on whether Wallace's failure to mention the different spelling of Aly's name constitutes reckless disregard for the truth. To show that Wallace acted with reckless disregard for the truth, Defendants must prove that he made the statements in his affidavits "with a high degree of awareness of their probable falsity." Garrison v. Louisiana, 379 U.S. 64 (1964). Here, Defendants simply have no evidence to suggest anything more than negligence. Wallace quoted the e-mail/letter accurately; his failure to detect or point out the variation in spelling is at most negligent. Notably, he used the same inaccurate spelling when discussing the certificates signed by Al-Aly. This evidences oversight, not a "high degree of awareness" that two spellings were used. Negligence and innocent mistake are insufficient to overcome the presumption of validity. Therefore, Defendants have not satisfied the first prong of the Franks test.

Even if the Court were to find the omission was more than negligent, Defendant cannot meet the second prong of the Franks test. In making the assessment, the Court considers whether once all of the information regarding the e-mail/letter spelling variations is included in the affidavit, sufficient information connecting Defendants' business activities to Iraq exists to establish probable cause.

Without question, the e-mail/letter is a key piece of evidence connecting Defendants to Iraq. However, it is not the only evidence. Defendants' efforts to minimize each additional piece of evidence fail. The Court does not review each item standing alone, but views the whole picture. As the Supreme Court instructed in Illinois v. Gates, 462 U.S. 213, 238 (1983), evidence must be judged on the totality of the circumstances and in a

reasonable and common sense manner. With this framework in mind, the Court assesses the merits of Defendants' arguments.

Defendants maintain that Yaser Rashid's opinion that the equipment was headed to Iraq is impossible to evaluate because there is no information before the Court regarding his sources of information, credibility, or motivation. The Court disagrees.

Here, there was ample basis to assess the weight to give Rashid's opinion. His opinion was based on his experience, his knowledge of the area where he was told the equipment was sent as well as his knowledge of where the equipment was needed. The magistrate judge's duty is to render such evaluations. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.

Rashid's opinion, coupled with other evidence meets the standard. A finding of "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 243-44 n. 13. The documents suggest an ongoing relationship between ATS and Iraq. The memorandum discovered in Baghdad mentions TIGS' middleman and references telecommunications equipment. Another e-mail recovered from TIGs' trash demonstrates that TIGS worked to secure post-embargo contracts in Iraq. These facts, coupled with the fact that ATS had a contract with Iraq to supply 500 receivers by January 25, 2003, which it did not honor, creates some likelihood

that Defendants also were involved in shipments to Iraq through ATS.  Although there is no evidence before the Court that Iraq was ATS' only customer, that is not the standard that must be met.  Likewise, the fact that an apartment in Turkey was an unlikely final destination for ten tons of equipment does not mean Iraq was the only likely destination.  Nevertheless, that is not the standard.  These facts, in conjunction with the statement that an agent of ATS told British Customs that the equipment was to be used "in an emergency, like war," and that war with Iraq was imminent in January 2003, combine to satisfy the existence of probable cause, especially with the link to Iraq provided by Rashid Defendants maintain that it makes no sense to hide the truth from Rashid, but given that fact that trade was illegal, his opinion warrants belief.  Accordingly, the Court finds that the plethora of reasonable explanations for the variations in spelling, combined with the additional facts support a fair probability that evidence of a crime would be found at TIGS and in Dawn Hanna's e-mail account.

### B. Overbreath

The Fourth Amendment requires that the items to be seized be described with particularity.  See Coolidge v. new Hampshire, 403 U.S. 443, 467 (1971).  According to Defendants, the particularity requirement was ignored in that the warrants allowed a wide ranging rummaging of a business and e-mail account.  They claim, that the search of TIGS "effectively authorized the search for and seizure of all records "referencing or related to the purchase or sale of computer, telecommunications or related equipment and materials from January 2001 through June 2004.  The search of Dawn Hanna's e-mail allowed the seizure of all e-mail messages as well as all data associated with those messages.

Defendants conclude that the search warrant is invalid for lack of a more particular description of the specific types of files to be searched for and seized during the examination of the Defendants' property. Specifically, Defendants contend that the search should have been limited to messages in which the subject line and to and from lines indicated that the messages pertained to the investigation.

Again, the Court disagrees. The degree of specificity required in the warrant must be responsive to the "crime involved" and the kind of evidence sought. United States v. Greene, 250 F.3d 471, 477 (6th Cir. 2001). The limitations contained in the warrants themselves were as specific as the circumstances and nature of the activity under investigation permitted. The seizures in Chicago and London show that TIGS acquired equipment from a variety of suppliers in the U.S. and abroad. Therefore, to limit the search to 'foreign trade," as suggested by Defendants, would have eliminated items relating to the shipments detained in Chicago. Likewise to limit the e-mail account search based on senders, recipients, or subject lines ignores the facts already known at the time of the requests for the warrants and the nature of the activity involved. The specificity suggested by Defendants is unreasonable under the circumstances. Subject lines are often blank or cryptic. Given the illegality of shipments to Iraq, it is unlikely that the subject line would contain information in that regard. To require such a pinpointed computer search, restricting the search to an email program or to specific search terms, would likely have failed to cast a sufficiently wide net to capture the evidence sought. Moreover, limiting the search to particular senders and recipients of e-mail would hamper the search for evidence tying defendants to illegal trade with Iraq.

The search warrant limited items to be searched for by category. See Govt.'s Brief, at p. 16; Govt.'s Ex. 1. This is adequate under the case law. See e.g. United States v. Adjani, 452 F.3d 1140, 1149-50 (9th Cir. 2006); Guest v. Leis, 255 F.3d 325, 335 (6th Cir. 2001) (observing that law enforcement officers "may legitimately ... check[ ]" during a computer search "to see that the contents of the directories corresponded to the labels placed on the directories," because "[s]uspects would otherwise be able to shield evidence from a search simply by 'misfiling' it" in a more innocuously named directory); United States v. Upham, 168 F.3d 532, 535 (1st Cir.1999) (observing that "it is no easy task to search a well-laden hard drive by going through all of the information it contains," and finding in that case that "[a] sufficient chance of finding some needles in the computer haystack was established by the probable-cause showing in the warrant application"). In this case, a review of the warrants shows that

A "computer search may be as extensive as reasonably required to locate the items described in the warrant." United States v. Grimmett, 439 F.3d 1263, 1270 (10th Cir. 2006) (internal quotation marks and citation omitted). Further, courts generally recognize that the search of a computer for evidence of criminal activity is no simple task, and that the myriad circumstances that might arise during a computer search defy a one-size-fits-all methodology. Computer files are easy to disguise or rename, and were courts to limit the warrant to such a specific search protocol, much evidence could escape discovery simply because of [a defendant's] labeling of the files documenting [his or her] criminal activity. The government should not be required to trust the suspect's self-labeling when executing a warrant. The Court finds the Government's analogy of the circumstances in this case

13

to those in United States v. Hill, 459 F.3d 966 (9th Cir. 2006), particularly persuasive. In denying an overbreadth challenge to a warrant issued to search computer files, the court observed:

> Forcing police to limit their searches to file that the suspect has labeled in a particular way would be much like saying police may not seize a plastic bag containing a powdery white substance if it is labeled "flour" or "talcum powder." There is no way to know what is in a file without examining its contents, just as there is no sure way of separating talcum from cocaine except by testing it.

Id., at 977.

Here, the warrant authorized the search for evidence of illegal exportation, not only evidence tied to particular individuals. It was as narrow as it could be under the facts of this case.

## IV. CONCLUSION

In sum, the Court finds Defendants have not met their burden of overcoming the presumption of validity of the warrant. There is no basis for finding the affidavit was deliberately or recklessly false. The failure to identify the variations in the spelling of Walid Al-Aly's name constitutes, at most, negligence. The attachments to the warrants sufficiently list the items to be searched.

Accordingly, the Court **DENIES** Defendants' motion to suppress.

**IT IS SO ORDERED.**

                                            s/Marianne O. Battani
                                            MARIANNE O. BATTANI
                                            UNITED STATES DISTRICT JUDGE

Date: June 17, 2008

## CERTIFICATE OF SERVICE

      Copies of this Order were mailed and/or electronically filed to counsel of record on this date.

                                                      s/Bernadette M. Thebolt
                                                      Deputy Clerk